1  DARA L. CASHMAN (SBN 115018)
   DENNIS R. CASHMAN (SBN 133390)
2  LAW OFFICES OF DENNIS CASHMAN
   Pier 9, Suite 100
3  San Francisco, CA  94111
   Telephone:    (415) 956-9900
4  Facsimile:    (415) 956-9210

5
   Attorneys For Defendant Steven Leung
6
                    UNITED STATES DISTRICT COURT
7
          NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION
8

9  UNITED STATES OF AMERICA,              Case No.: 09-CR-0110 SI

10                      Plaintiff,        **DEFENDANT  STEVEN LEUNG'S**
                                          **SENTENCING MEMORANDUM AND**
11 vs.                                    **MOTION FOR DEPARTURE**

12 STEVEN LEUNG,
                                          **Date: April 29, 2013**
13                      Defendant         **Time: 11:00 a.m.**
                                          **Judge: The Honorable Susan Illston**
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Leung Brief

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION…………………………………………………………2

II.     GUIDELINE CALCULATION……………………………………………3

        A.      THE VOC Calculation In The PSR Is Inaccurate………………………3

        B.      Role In Offense……………………………………………………………4

        C.      The Defendant Should Be Receive Discretionary Reduction For Acceptance
                Of Responsibility …………………………………………………………7

        D.      Conclusion………………………………………………………………..9

III.    SECTION 3553(A) FACTORS

        A.      The Guidelines Overstate Defendant's Responsibility……………………9

        B.      Sentencing Disparity Must Be Avoided………………………………...10

        C.      The Was An Aberrant Act………………………………………………17

        D.      Mr. Leung's Health Is A Factor…………………………………………18

        E.      Mr. Leung Has Significant Family Responsibilities………………………18

        F.      There Was A Lack of Criminal Motivation And Compensation And The Harm
                Caused Was Offset Somewhat By The Good The Product Produced Provided ..19

IV.     CONCLUSION……………………………………………………………..20

# TABLE OF AUTHORITIES

Page

## Cases

1.   *United States v. Booker*,
     543 U.S. 220 (S.Ct. 2005)……………………………………………………10

2.   *United States v. Caperna*,
     251 3d 827, 831-32 (9th Cir. 2001)…………………………………………..10

3.   *United States v. Petti*,
     973 F.2d 1441, 1447 (9th Cir. 1992)……………………………………6, 10

## Statutes

1. USSG 1B1.3, comment. (N.2)……………………………………………………3

2. USSG 2R1.1(b)(2)(B)……………………………………………………………4

3. USSG 2R1.2(a)……………………………………………………………………9

4.  USSG 2r1.2 (b)(2) ………………………………………………………………9

5. USSG 3B1.1, comment. (N. 1)…………………………………………………5

6. USSG 3B1.2(b)……………………………………………………………………9

7. USSG 3E1.2, comment. n. 2……………………………………………………7

8. USSG 3E1.1(a)………………………………………9, 11, 12, 13, 14, 15, 16, 17

## I.  INTRODUCTION

Defendant Steven Leung was first tried in January 2012 along with six other Defendants.  After several months of trial, two defendants were acquitted, four were convicted, and the jury was unable to come to a verdict as to Mr. Leung.  He was subsequently tried again and now stands before the court convicted of a violation of 15 U.S.C. Section 1-Price Fixing.  The Presentence Report (PSR) filed states a Guideline Provision of 108 to 120 months, and a Statutory Provision of 10 years.  The PSR correctly recommends a lower sentence than that set out in its Guideline calculations.  However, the defendant objects to the Guideline calculation, as set out below.  Even assuming that guideline, the defendant strongly urges this court to impose a sentence even lower than the variance recommended in the PSR.  The defense would request that the court sentence Defendant Steven Leung to a term of 6 months in a Federal Camp and 6 months home detention for a total sentence of 12 months, with a period of Supervised Release during the six months of home detention.  This is a reasonable sentence as illustrated by the below stated reasons.

## II.  <u>GUIDELINE CALCULATIONS</u>

The defendant respectfully disagrees with the calculation of the Guideline Provision as set out in the PSR.  The probation officer has made certain miscalculations based on assumption of facts that are incomplete and inaccurate.  In addition, the defense requests that this Court use its discretion to apply a guideline reduction based on Defendant's attempt to accept responsibility before trial, and his legitimate reasons for going to trial.

A.    <u>The VOC Calculation In The PSR Is Inaccurate</u>

The Guideline calculation for Volume of Commerce (VOC) set out in the probation report is not accurate because it covers the entire conspiracy, and the acts of all the conspirators, which is inappropriate.  <u>USSG 1B1.3, comment. (N.2)</u> states:

"Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant.

. . . A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of the conduct."

The PSR, at paragraph 20, accurately describes the dates of the "crystal meetings" Mr. Leung attended. He attended no others, brought back no further information to forward the conspiracy, and returned to his legitimate duties as a sales manager. The $2.3 billion in VOC attributed to Mr. Leung in the probation report is for the entire scope of the conspiracy. It is also for all the participants in the entire conspiracy. He is entitled to an individualized accounting for *HIS* alleged conduct, not conduct with which he had nothing to do. He cannot be held accountable for the VOC of other companies and for a time period during which he was not involved in the conspiracy.

Mr. Leung was a sales director with responsibilities for one half the sales of monitors by AUO. He had no other responsibilities for any other products. As stated in the PSR, his first "crystal meeting" was May 15, 2002, and his last was August 5, 2003. *HIS* volume of commerce was one half of the monitor sales during that time period. The government's own expert, Dr. Leffler, estimated 44.8% of total sales made their way to the United States. Total sales for the product for which the defendant had responsibility was $57,251,000, according to the Government's calculations. Thus, $25.6 million is the accurate VOC for Mr. Leung. Instead of the 16 level increase suggested in the PSR, Mr. Leung's actual guideline increase should only be a four level increase. (USSG 2R1.1(b)(2)(B).

B. Role In Offense

The PSR suggests Mr. Leung should receive an upward adjustment of three levels for his role in the offense as a manager. In order for there to be a role in the offense adjustment, the

defendant must exercise some control or direction over other "participants." "Participants" is described as other criminally responsible persons. (See, USSG 3B1.1, comment. (N. 1).

There has been absolutely no evidence offered that any of Mr. Leung's sales staff were criminally responsible. They have not been charged. They had nothing to do with price fixing, and thus were not "participants", therefore no upward offense adjustment should apply here. Further, the PSR states that Mr. Leung "exercised decision-making authority, . . ."  There is absolutely no evidence that he had ANY decision making authority vis-a-vis the *conspiracy* and none was cited in the PSR. A mere conclusion is insufficient to support the adjustment, let alone an inaccurate one. This conclusion is based on inaccurate facts and ignores substantial testimony from the trial which made it clear that Mr. Leung was a lower level manager, who had no authority to make price agreements for the company.  Mr. Leung was sent to "crystal meetings" by his supervisors and given the role of note taker, largely due to his higher ability to write in English, the language in which most company correspondence was written.   While it could be argued that he did aid the conspiracy by transmitting the information from the meetings, it was also clear that he did not have the authority to set prices outside of a range set by his superiors. This included a bottom price *and* a maximum price.  The email referred to in the PSR demonstrates nothing more than the fact that Mr. Leung expected sales representatives in his unit to abide by the price range he gave them, which in turn was given to him by *his* superiors, and which he was expected to abide by.  It was only his superiors that had the authority to set prices in line with the prices discussed at the "crystal meetings".

Nor is it surprising that on occasions Mr. Leung authorized prices that were in line with those from the meetings.  However, that does not mean *he* was the one that made the decision to use those prices.  The government's own witness, Mr. Antoinne Simonette testified that he believed Mr. Leung needed his supervisor's approval to set ultimate prices, and Mr. Simonette often  went over Mr. Leung's head during negotiations to deal directly with his supervisor.  Many

emails demonstrated that Mr. Leung had to have the approval of his supervisors during

negotiations  In addition, government witness Michael Wong stated flat out Mr. Leung did not

have the authority to make agreements on prices for the company.  Thus, Mr. Leung's role was

much more of a minor one than that which the PSR suggests.

It should also be noted that Mr. Leung only attended 12 meetings, and with the exception

of one meeting, always attended in the company of other AUO employees.  Mr. Leung was

usually the junior AUO employee at these meetings, and was never the most senior employee.

All of the meetings he attended occurred months after the initial four or five meetings, where the

plan was created and the blue print for it devised. Mr. Leung played no role in developing the

plan, nor did he ever attend the higher level, Vice President meetings, where crucial decisions

and agreements were made.

As the court stated in *United States v. Petti*, 973 F.2d 1441, 1446 (9th Cir. 1992), the

relevant comparison in determining whether an adjustment in offense level is appropriate is to the

conduct of co-participants in the case at hand.  When Mr. Leung's conduct is compared to other

co-participants in this case, it is apparent he played a much less culpable role.  The court need

look at only a couple of examples to see this is true.  Mr. C.C. Liu, for instance, testified in the

trial that he was one of the major initiator's in the scheme.   In fact, he initially attempted to

organize a different price fixing scheme with his company and Samsung alone.  When that didn't

work, he then helped organize the scheme with the Taiwanese makers, and helped to bring in the

other Korean makers.  He explained that he helped develop the blue print of the plan, and

carefully carried it out.  He attended almost every single meeting, during the time he was

employed at his company.  Other witnesses testified to the vocal leadership role he played at the

meetings.  Mr. Liu was truly a major actor in the scheme.

Many of the other participants also were involved in the initial, early meetings, where the

scheme was laid out, and where it was the most effective.  For instance, Brian Lee was at the

very beginning meetings, and was well aware of the reasons behind the meetings.  He testified at the second trial, that he did indeed play a major role in the scheme.  The co-participants included Presidents and CEOs of the various companies, who had the authority to make the agreements, and did so at the Executive Level meetings, meetings Mr. Leung did not attend.  These higher level executives could and did call special meetings among themselves in order the further the goals of the conspiracy, something Mr. Leung did not have the authority to do.  Instead, in comparison to many of the other participants, his was a more clerical role.  Consequently, rather than an upward adjustment for his role in the offence, the defense contends Mr. Leung should receive a "minor role" downward adjustment to the Guidelines of three levels.

      C.     <u>The Defendant Should Receive A Discretionary Reduction For Acceptance of Responsibility</u>

      While it is true that Mr. Leung did go to trial and that would usually bar him from a reduction for acceptance of responsibility, it is also true that there are certain exceptions to that rule that allows the court to exercise its discretion to apply a reduction even after trial. The defense believes that the circumstances in this case justify that exercise of discretion. While the adjustment for acceptance of responsibility generally does not apply to a defendant who has gone to trial, conviction by trial does not automatically preclude a defendant from consideration for such a reduction (<u>See, USSG 3E1.2, comment. n. 2</u>). In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). This was the case, here, as the defense did and still does believe that there are significant unresolved legal issues in regards to how the FDAIA and Rule of Reason should be applied to foreign nationals accused of price fixing.  At the beginning of this case, this court even stated that these were

uncharted waters.  It was, therefore, reasonable for the defendant to want to preserve these issues for review by an appellate court, and if he had pled guilty he would not have been able to do so.

There is yet another, and perhaps more compelling, argument for Mr. Leung to receive this unusual exercise of discretion. He actually did attempt to resolve this case before the re-trial, but was unable to do so through no fault of his own.  Before the re-trial began, the court inquired as to whether or not the parties were interested in a settlement conference, and the defense indicated a willingness to do so.  A magistrate was assigned, and the defense prepared extensive settlement conference memos in anticipation of the September 24, 2012 settlement conference. Mr. Leung, who unlike the other defendants, retained his passport throughout the entire proceedings, made a special trip from Taiwan to the United States to negotiate in good faith with the government.

However, before the date set for the settlement conference, this court sentenced the co-defendants in the case.  Based on these sentences, the government declined to enter into settlement negotiations with Mr. Leung, indicating their possible intention to appeal the sentence of the co-defendants. Thus, no offer was extended and Mr. Leung was not able to accept responsibility.  While it is technically true that he could have entered into an open plea with the court, it would have been irresponsible for his attorneys to advise him to do so.  While the defense could expect a fair and reasonable sentence from the court, the government would not commit to an agreement not to appeal that sentence.  Indeed, it was only after Mr. Leung's conviction that the government finally abandoned its cross appeal of the sentences imposed on the co-defendants.  If Mr. Leung had pled guilty with no assurances from the government, thereby giving up all his underlying appellate rights, the government could have then appealed his sentence as well.  During the co-defendants' sentencing hearing, the government argued for a ten year sentence. If Mr. Leung had pled open and the government successfully appealed his sentence, he would be subject to that ten year sentence with no right to withdraw his plea, and no

right to pursue an appeal on the underlying legal issues. The government's refusal to try and

settle the case with Mr. Leung put him in an untenable position beyond his control. He did not

testify at trial to disclaim his responsibility. This, combined with his desire to test important

legal principles, would support this court in exercising its discretion and allowing Mr. Leung a

two level reduction from the guideline.

    D.    <u>Conclusion</u>

    The defense believes the Guideline calculation for Mr. Leung should be a

level 12, with a range of 10-16 months, based on the following calculations:

```
1. USSG 2R1.2(a) Base                          12
2. USSG 2r1.2 (b)(2) VOC $25.6 million          4
                                               16
3. USSG 3B1.2(b) minor role                    -2
                                               14
4. USSG 3E1.1(a) Acceptance of Responsibility  -2
        TOTAL OFFENSE LEVEL                    12,  10-16 months
```

**III. SECTION 3553(A) FACTORS**

    A.    <u>The Guidelines Overstate Defendant's Responsibility</u>

    Although it is true that even under the defense calculations, the volume of commerce in

Mr. Leung's case is over $25.6 million, his compensation was not in any way tied to the volume

of commerce. He was not an officer of the company. He was paid a salary plus bonus, as were all

employees. The defense provided financial records to the probation department that prove Mr.

Leung's compensation from AUO from 1992 through 2012, ranged from $55,306 to $105,046

and averaged $76,635 over that period. In comparison to other participants in this case, his

compensation was a fraction of those other's compensation. His net worth as set out in the PSR

reflects that as well. He clearly did not profit from the crime, and had no criminal motivation.

The defense is aware of potential testimony from Hubert Lee, an acquitted co-defendant, and

James CP Chen, an AUO employee who received a target letter, but was never prosecuted. Both

of these men attended Crystal Meetings, and received reports from the meetings.  They were prepared to swear under penalty of perjury that they attended the meetings at the direction of their supervisor, and were not given authority to do anything other than take notes and report back to their supervisors. (Mr. Chen actually began to testify to this at the trial, but an objection was sustained and the testimony was stricken).  Hubert Lee was Mr. Leung's direct peer, as he was in charge of the other half of the monitor division.  He attended several meetings with Mr. Leung, and believed that he had received the same instructions concerning the meetings as Mr. Leung did. A two level role in the offense reduction is not sufficient to reflect Mr. Leung's culpability. Recognizing that the Guideline range overstates the seriousness of his conduct more fairly represents Mr. Leung's actual culpability.

B.  <u>Sentencing Disparity Must Be Avoided</u>

As the PSR recommendation recognizes, disparity in sentencing should be avoided. Beginning in 1992, the Ninth Circuit, in a series of cases, approved of the notion that the Court can depart to equalize the sentences of defendants convicted of the same offenses. See, ***United States v. Petti***, 973 F.2d 1441, 1447 (9th Cir. 1992). Indeed, in a case decided before ***United States v. Booker***, <u>543 U.S. 220</u> (2005), and therefore during the era of mandatory Guideline sentences, the court stated that within case sentencing disparity between even cooperating and non-cooperating defendants is within the sound judgment of the sentencing court. ***United States v. Caperna***, 251 F.3d 827, 831-32 (9th Cir. 2001).  While the PSR does refer to the co-defendants sentences in this case, it is more appropriate to consider any sentence Mr. Leung may receive in comparison to both *cooperating* and non-cooperating defendants, all of whom were convicted of the same offense.  Listed below is information regarding each cooperator's role in the offense, the guideline calculations, and the actual sentence imposed.

1    1.    **Chieng-Hon "Frank" Lin**

2        Mr. Lin was the Chairman and CEO of Chunghwa Picture Tubes. Chunghwa Picture

3    Tubes' affected volume of commerce was stated to be $357,677,000. As Chairman and CEO, Mr.

4    Lin admitted that he managed and supervised at least 5 individuals in this illegal conduct. The

5    agreed upon Guideline calculation in Mr. Lin's case was:

6
7    USSG 2R1.1(a) Base Offense Level          12
     (b)(2) Vol. of Commerce $250-$500 Mil      10
8                                                22
     USSG 3E1.1(a)&(b) Accept. Respons.         -3
9    **TOTAL OFFENSE LEVEL**                 **19 (30-37 Months)**

10       The agreed upon sentence, and that which the Court imposed, was **270 days (9 months)**

11   imprisonment, a $50,000 fine, no restitution, and no term of Supervised Release to follow

12   imprisonment. As Mr. Lin is a United States citizen, there are no immigration implications for his

13   conviction.

14       2.    **Chang Suk Chung**

15       Mr. Chung was the Vice-President for Monitor sales for LG Philips. LG Philips affected

16   volume of commerce was stated to be $2.5 Billion. As Vice-President of Monitor sales, Mr.

17   Chung admitted that he managed and supervised at least 5 individuals in this illegal conduct and

18   that the amount of affected commerce by his conduct was $500 million. The agreed upon

19   Guideline calculation in Mr. Chung's case was:

20
21
22   USSG 2R1.1(a) Base Offense Level          12
     (b)(2) Vol. of Commerce $250 mil -$1 Billion   12
23                                                24
     USSG 3B1.1(b) Mgr/sup 5+ Inds.             3
24                                               27
     USSG 3E1.1(a)&(b) Accept. Responsibility   -3
25   **TOTAL OFFENSE LEVEL**                  **24  (51-63 Months)**

26

27

28

The agreed upon sentence, and that which the Court imposed, was **7 months** imprisonment, a $25,000 fine, no restitution, and no term of Supervised Release to follow imprisonment.

### 3.   Chih-Chun "CC" Liu

Mr. Liu was the Vice-President of Sales for Chunghwa Picture Tubes. Chungha Picture Tubes affected volume of commerce was stated to be $357,677,000. As Vice-President of Sales, Mr. Chung admitted that he managed and supervised at least 5 individuals in this illegal conduct and that the amount of affected commerce by his conduct was $250-$500 million. Mr. Liu was instrumental in the initial organization and creation of the plan, along with representatives from Samsung.  He testified that in his capacity as a representative of CPT, he met with Samsung early in 2001 to try to form a price fixing conspiracy among those two companies alone.  However, it was decided at these initial meetings that other LCD makers needed to be included, and Mr. Liu helped to organize these meetings.  He attended all meetings from the very beginning until his initial retirement in 2005.  He attended the Vice President level meetings, and was involved in all price fixing agreements.  The agreed upon Guideline calculation in Mr. Liu's case was:

| | |
|---|---|
| USSG 2R1.1(a) Base Offense Level | 12 |
| (b)(2) Vol. of Commerce $250 mil -$500 mil | <u>10</u> |
| | 22 |
| USSG 3B1.1(b) Mgr/sup 5+ Inds. | <u> 3</u> |
| | 25 |
| USSG 3E1.1(a)&(b) Accept. Responsibility | <u>-3</u> |
| **TOTAL OFFENSE LEVEL** | **22  (41-51 Months)** |

The agreed upon sentence, and that which the Court imposed, was 210 days **(7 months**) imprisonment, a $30,000 fine, no restitution, and no term of Supervised Release to follow imprisonment.

### 4.   Hsueh-Lung "Brian" Lee

Mr. Lee was the Vice-President of Sales for Chunghwa Picture Tubes. Chungha Picture Tubes affected volume of commerce was stated to be $357,677,000. As Vice-President of Sales,

Mr. Lee admitted that the amount of affected commerce by his conduct was $250-$500 million.

Mr. Lee testified at trial that he had a major role at the meetings, and was not just a note taker.

Mr. Lee was at the initial organizational meetings and attended the meetings regularly for years.

He attended many more meetings then Mr. Leung did.  In addition, Mr. Lee orchestrated the

destruction of evidence once he heard rumors that the government was investigating the

conspiracy.  The agreed upon Guideline calculation in Mr. Lee's case was:

| | |
|---|---|
| USSG 2R1.1(a) Base Offense Level | 12 |
| (b)(2) Vol. of Commerce $250 mil -$1 Billion | <u>10</u> |
| | 22 |
| USSG 3E1.1(a)&(b) Accept. Responsibility | <u>-3</u> |
| **TOTAL OFFENSE LEVEL** | **19  (30-37 Months)** |

      According to the Factual Basis for the plea in this case, the Government does not allege,

despite Mr. Lee's position as Vice-President of Sales, any supervision or management of other

persons involved in the criminal conduct. It is unknown if this is factually based or a concession

by the Government in the Plea Agreement, however at trial Mr. Lee testified he was a supervisor

at a level of salespeople, and did have some pricing authority and input.  In actual fact, Mr. Lee's

position in his company was strikingly similar to that of Mr. Leung's for AUO.  In the

conspiracy, however, Mr. Lee had a more significant role than did Mr. Leung.  While they both

acted as note takers at the meetings, Mr. Lee was part of the initial meetings, attended many more

meetings, and as stated above, displayed his guilty conscience by ordering many employees to

destroy evidence.  Mr. Leung clearly did not make any attempt to destroy or hide the notes he

took at the meetings he attended.

The agreed upon sentence, and that which the Court imposed upon Mr. Lee, was 180 days (**6**

**months**) imprisonment, a $20,000 fine, no restitution, and no term of Supervised Release to

follow imprisonment.

5.      **Bock Kwon**

Mr. Kwon was the Vice-President and President of LG Philips. LG Philips affected volume of commerce was stated to be $2.5 Billion. As Vice-President and President, Mr. Kwon admitted that he managed and supervised at least 5 individuals in this illegal conduct and that the amount of affected commerce by his conduct was $500 million. Mr. Kwon attended one of the first high level Vice President meetings in 2001.  The agreed upon Guideline calculation in Mr. Kwon's case is:

| | |
|---|---|
| USSG 2R1.1(a) Base Offense Level | 12 |
| (b)(2) Vol. of Commerce $250 mil -$1 Billion | 12 |
| | 24 |
| USSG 3B1.1(b) Mgr/sup 5+ Inds. | 3 |
| | 27 |
| USSG 3E1.1(a)&(b) Accept. Responsibility | -3 |
| **TOTAL OFFENSE LEVEL** | **24** (51-63 Months) |

The agreed upon sentence, and that which the Court imposed, was **12 months and one day** of imprisonment, a $30,000 fine, no restitution, and no term of Supervised Release to follow imprisonment.

6.      **Chu-Hsiang "James" Yang**

Mr. Yang was the Director of Sales for Chi Mei Optoelectronics Corporation. Chi Mei's affected volume of commerce was stated to be $985,500,000. As Director of Sales, Mr. Yang admitted that he managed and supervised at least 5 individuals in this illegal conduct and that the amount of affected commerce by his conduct was $500 million. The agreed upon Guideline calculation in Mr. Yang's case is:

| | |
|---|---|
| USSG 2R1.1(a) Base Offense Level | 12 |
| (b)(2) Vol. of Commerce $250 mil -$1 Billion | 12 |
| | 24 |
| USSG 3B1.1(b) Mgr/sup 5+ Inds. | 3 |
| | 27 |
| USSG 3E1.1(a)&(b) Accept. Responsibility | -3 |
| **TOTAL OFFENSE LEVEL** | **24** (51-63 Months) |

The agreed upon sentence, and that which the Court imposed, was **270 days (9 months**) imprisonment, a $25,000 fine, no restitution, and no term of Supervised Release to follow imprisonment.

### 7.    Jau-Yang (J.Y.) Ho

Mr. Ho was the *President* of Chi Mei Optoelectronics Corporation. Chi Mei's affected volume of commerce was stated to be $985,500,000. As President, Mr. Ho admitted that he managed and supervised at least 5 individuals in this illegal conduct and that the amount of affected commerce by his conduct was $500 million.  Mr. Ho attended the very first meeting, during which the plan was created and the blue print agreed upon.  The agreed upon Guideline calculation in Mr. Ho's case is:

| | |
|---|---|
| USSG 2R1.1(a) Base Offense Level | 12 |
| (b)(2) Vol. of Commerce $250 mil -$1 Billion | <u>12</u> |
| | 24 |
| USSG 3B1.1(b) Mgr/sup 5+ Inds. | <u>3</u> |
| | 27 |
| USSG 3E1.1(a)&(b) Accept. Responsibility | <u>-3</u> |
| **TOTAL OFFENSE LEVEL** | **24  (51-63 Months)** |

The agreed upon sentence, and that which the Court imposed, was **14 months** imprisonment, a $50,000 fine, no restitution, and no term of Supervised Release to follow imprisonment.

### 8.    Wen-Hung "Amigo" Huang

Mr. Huang was the Director of Sales of Chi Mei Optoelectronics Corporation. Chi Mei's affected volume of commerce was stated to be $985,500,000. As Director of Sales, Mr. Huang admitted that he managed and supervised at least 5 individuals in this illegal conduct and that the amount of affected commerce by his conduct was $500 million. Mr. Huang was at two of the initial meetings, during which the plan was agreed upon and the blue print decided upon.  The agreed upon Guideline calculation in Mr. Huang's case is:

```
USSG 2R1.1(a) Base Offense Level              12
(b)(2) Vol. of Commerce $250 mil -$1 Billion  12
                                              24
USSG 3B1.1(b) Mgr/sup 5+ Inds.                 3
                                              27
USSG 3E1.1(a)&(b) Accept. Responsibility      -3
```
**TOTAL OFFENSE LEVEL              24  (51-63 Months)**

The agreed upon sentence, and that which the Court imposed, was **270 days (9 months)** imprisonment, a $25,000 fine, no restitution, and no term of Supervised Release to follow imprisonment.

### 9.   **Chen-Lung Kuo**

Mr. Kuo was the Associate Vice-President and Vice-President of Sales of Chi Mei Optoelectronics Corporation. Chi Mei's affected volume of commerce was stated to be $985,500,000. As Associate VP and VP of Sales, Mr. Kuo admitted that he managed and supervised at least 5 individuals in this illegal conduct and that the amount of affected commerce by his conduct was $500 million. The agreed upon Guideline calculation in Mr. Kuo's case is:

```
USSG 2R1.1(a) Base Offense Level              12
(b)(2) Vol. of Commerce $250 mil -$1 Billion  12
                                              24
USSG 3B1.1(b) Mgr/sup 5+ Inds.                 3
                                              27
USSG 3E1.1(a)&(b) Accept. Responsibility      -3
```
**TOTAL OFFENSE LEVEL              24  (51-63 Months)**

The agreed upon sentence, and that which the Court imposed, was **270 days (9 months)** imprisonment, a $35,000 fine, no restitution, and no term of Supervised Release to follow imprisonment.

### 10. **Jui Hung "Sam" Wu**

Mr. Wu was the Executive Director of Global Sales for Hannstar Corporation. Hannstar's affected volume of commerce was stated to be $107 million. As Executive Director of Global Sales, Mr. Wu admitted that the amount of affected commerce by his conduct was $100 million. The agreed upon Guideline calculation in Mr. Wu's case is:

| USSG 2R1.1(a) Base Offense Level | 12 |
| (b)(2) Vol. of Commerce $100-$250 Mil. | 8 |
| | 20 |
| USSG 3E1.1(a)&(b) Accept. Responsibility | -3 |
| **TOTAL OFFENSE LEVEL** | **17 (24-30 Months)** |

The agreed upon sentence, and that which the Court imposed, was **210 days (7 months)** imprisonment, a $20,000 fine, no restitution, and no term of Supervised Release to follow imprisonment.

The above comparison shows that the cooperating defendants received sentences ranging from 6 months to 14 months (with Guideline ranges up to 63 months), and each and every one of the above cooperators occupied a far superior role than Mr. Leung in their roles in the conspiracy charged by the Government. In addition, almost every single one of the cooperators occupied a much higher position in their respective companies, and none of them held a lesser position.

As noted in the PSR report, this court found that the Guideline calculation for the co-defendants Dr. Hsiung and Mr. H. B. Chen was 32, (121-151 months). Each of these co-defendants were top level officers in AUO, and had substantial stock and financial interest in the company, unlike Mr. Leung. This court found that an appropriate sentence for each of them was 36 months. While the PSR recognizes the need to avoid sentencing disparity with its recommendation of 24 months, the defense would argue this figure does not go far enough to truly avoid sentencing disparity. This figure does not fully take into account the cooperators' sentences, nor does it sufficiently take into account the difference between Mr. Leung's role in the conspiracy and that of the others. Since a reasonable and appropriate sentence for the top officials of the company is 36 months, and since Mr. Leung's role and financial position in the company was significantly lesser, an equitable sentence should be even less than 24 months. This is especially true if this court adopts in whole or in part the defendant's guideline calculations.

C.  <u>This Was An Aberrant Act</u>

Up to this point in his life, Steven Leung has led an exemplary life. This offense is the single blemish on an otherwise laudable life that includes an excellent education, devotion to family, and a sterling career. The offense conduct does not reflect the manner by which Mr. Leung has conducted his life and, in fact, spanned a relatively short period of time in the context of his 47 years.  Mr. Leung has demonstrated his respect for the law both by the manner in which he has led his life in all other respects, and in the way he had conducted himself during this trial. Mr. Leung was the only defendant from AUO who retained his passport throughout all the proceedings, which spanned for him a period of over two and a half years.  He had the freedom to return to Taiwan, and he did indeed do so on many occasions. Despite this, he willingly submitted to the authority of the court, participating fully and respectfully in the proceedings, and even returning from Taiwan after the convictions of several of the co-defendants.  During the re-trial, he voluntarily surrendered his passport to Probation once the jury began deliberations. These actions emphasize his respect for the law and the judicial system.

D.     <u>Mr. Leung's Health Is A Factor</u>

As pointed out in the PSR, Mr. Leung underwent emergency triple coronary by-pass surgery in Taiwan on February 14, 2011.  Mr. Leung, at 47, is very young to have suffered from a heart attack, and it was brought on, in part, by the stress of being charged with a felony offense, a situation well outside his prior experiences.. He is, in fact, still recovering from the ordeal of emergency surgery, and must be vigilant in monitoring his health. He suffers from several related conditions, and is on several medications. He is in the process of obtaining a U.S. based physician, as he requires close medical supervision. Incarceration, given his health history, is risky and warrants a mitigated sentence.

### E.   Mr. Leung Has Significant Family Responsibilities

Mr. Leung is the primary provider for his two young children, ages five and ten. Although his wife has a job, her income is insufficient to maintain the family. A prolonged absence by Mr. Leung could jeopardize the financial wellbeing of the family. This is especially true as Mr. Leung's family have moved to the United States in order to be close to him for the duration of his sentence.  The children have already been enrolled in school in the Bay Area.  This means that Mr. Leung will need to keep up two households, or risk losing his home in Taiwan.  This is his only significant asset, and the family does plan on returning to Taiwan once his sentence is completed, and they will need a home to return to.  Also, Mrs. Leung is only guaranteed continued employment from her current employer for three more months.  If the family is forced to stay here for many months, Mrs. Leung may not have work.  (She has applied for an Alien Relative immigration status in order to be able to stay and support her husband). Mr. Leung has been working for AUO while here in the United States, and could continue to do so if not incarcerated.

Perhaps more importantly, Mr. Leung is quite close emotionally to his two very young children and his absence will have a negative impact on them at this crucial stage of their lives. They are at an age when having both parents in their lives is very important to their emotional wellbeing.  They are already having to deal with the trauma of starting school in an unfamiliar country, with little knowledge of the language.  Mr. Leung's son, Jordan, was a top student in Taiwan, winning honors and awards for his academic achievements.  Since enrolling in the San Ramon School District, Jordan has received stellar grades in all classes, except English.  He struggles with this new language, and Mrs. Leung herself is not very fluent in English, and is unable to aid the children as much as their father could.  Celine had just started school for the first time in Taiwan, and now must start again in a new country.  Mr. Leung has been working

diligently with Jordan and Celine, but the longer they must be away from their father, the harder it will be on the whole family.

     F.   There Was A Lack Of Criminal Motivation And Compensation And The Harm Was Offset Somewhat By The Good The Product Produced Provided

     As pointed out earlier, Mr. Leung does not own significant stock in AUO, and did not reap any monetary rewards for his actions in the conspiracy. His motivation for his actions was only to do a good job for his company and to follow the orders of his superiors. It is clear that in Asian cultures loyalty to one's company is highly valued, and the work ethic is much more elevated than in some other cultures. Mr. Leung was only trying to do his job, and not trying to criminally profit in any way. Indeed, as this court recognized, even Mr. Leung's superiors were not truly motivated to obtain criminal profit, but were simply trying to make sure their company survived in a very difficult economic time. Ironically, if the companies had not engaged in the charged conduct, it is highly likely many of them would not have survived the economic climate of the time. If that had happened, the consumer would probably have ended up in a worse position, with TFT/LCD flat screen panels costing more than they would have without the charged conduct.

     As this court also recognized, AUO and the other makers did and do continue to provide a very valuable product for the world. Again, one wonders if the world would have such access to all these valuable products if the Taiwanese and Korean makers had not been able to survive the terrible economic downturn described by the experts in this case. While not excusing the conduct, this is a legitimate factor to consider in determining the appropriate sentence. This is especially true in the case of lower level employees like Mr. Leung, who did not participate in the creation of the conspiracy, and who did not reap huge financial benefits from it.

## IV. CONCLUSION

The court in determining a reasonable sentence must strive to arrive at a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing.  In this case, the defense would urge this court to impose a sentence that would take into account the defendant's health, his family situation, and his very minor role in the actual conspiracy. The defense would propose a sentence of 12 months, split between six months in a Federal Camp, such as Lompoc, and six months served on Home Detention.  The defense would request a term of Supervised Release for the period of six months during which the defendant was on Home Detention, allowing him to return home to Taiwan after his sentence was completed.  This proposed sentence falls within the defense Guideline calculations, and is reasonable under all the circumstances, regardless of the Guideline calculations.  It takes into account the need for Mr. Leung to pay his debt to society, yet also will not jeopardize his health, or cause undue damage to his family structure.   The defense implores this court to accept this disposition as reasonable and fair.

DATED:  April 21, 2013                              Respectfully Submitted,

                                                                      /s/ Dara Cashman_____
                                                                      DARA L. CASHMAN

                                                                      DENNIS R. CASHMAN